GARMAN TURNER GORDON LLP
ERIC R. OLSEN
Nevada Bar No. 3127
Email: eolsen@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARCUS ANDRADE AND NAC FOUNDATION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JAPHETH DILLMAN; BLOCK BITS CAPITAL, LLC; BLOCK BITS CAPITAL, GP; BLOCK BITS AML HOLDINGS, LLC; BENJAMIN BOYER, INDIVIDUALLY AND AS TRUSTEE OF BOYER FAMILY TRUST AND BENJAMIN BOYER TRUST; and DOES I through XXX, inclusive,<br><br>Defendants. | Case No. 2:20-cv-01021-JAD-NJK<br><br>**APPLICATION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS BLOCK BITS AML HOLDINGS, LLC AND JAPHETH DILLMAN** |

Plaintiffs, MARCUS ANDRADE AND NAC FOUNDATION, LLC (the "NAC" or "Plaintiffs"), by and through counsel, the law firm of Garman Turner Gordon LLP, files its application for default judgment against Defendants BLOCK BITS AML HOLDINGS, LLC ("BB AML Holdings") and JAPHETH DILLMAN ("Dillman").

This Application is made and based on the below Memorandum of Points and Authorities, the Declaration of Marcus Andrade ("Andrade Decl.") attached hereto as **Exhibit 1**, the Declaration of Eric R Olsen ("Olsen Decl.") attached hereto as **Exhibit 2**, and the papers and pleadings already on file herein.

The clerk of court entered default against BB AML Holdings on January 14, 2021, for failure to file an answer or other responsive pleading [ECF No. 38]. The Clerk of the Court entered

the Default against Dillman, on January 29, 2021, for failure to file an answer or other responsive pleading. [ECF No. 43].

NAC previously filed an Application for Entry of Default Judgment Against Block Bits Capital LLC and Block Bits Capital GP [ECF No. 30]. The Court conducted a hearing concerning that application on August 26, 2021. At the hearing, the Court directed counsel for NAC to file applications for default judgment as to the defendants remaining in this action, namely Dillman and BB AML Holdings.[1]

Therefore, Plaintiffs respectfully request that the Court grant the instant Application, and order as follows:

Findings of Fact, Conclusions of Law, and a Judgment in Plaintiffs' favor and against Defendants Dillman and Block Bits AML Holdings, LLC, as well as Block Bits capital LLC and Block Bits Capital GP, on Plaintiffs' claim for declaratory relief to the effect that as to these defendants nothing in any contract or business relationship between that Defendant and either NAC or Mr. Andrade creates a duty or imposes liability on Plaintiffs with respect to any clients/investors/customers of that Defendant. Plaintiff submits a proposed default to that effect as **Exhibit 5** hereto.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In this action, as to Dillman and the Defendant entities in his control – including BB AML Holdings – Plaintiffs seek a declaratory judgment that nothing in any contract or business relationship between those Defendants and either NAC or Mr. Andrade creates a duty or imposes liability on Plaintiffs with respect to any clients/investors/customers of those Defendants, including but not limited to Mr. Boyer or the Boyer Trusts.

Dillman and BB AML Holdings were both served with the Complaint and default was taken based on its failure to answer or otherwise appear in the action. Thus, the factual allegations of the complaint are taken as true. Plaintiff now moves for default judgment making a declaration

---

[1] See Court Minutes August 26, 2021 [ECF No. 48].

as stated in the complaint against the Dillman and BB AML Holdings. This filing brings the matter of default judgments against all four remaining defendants before the Court and avoids piecemeal disposition of the action.

## II. STATEMENT OF FACTS[2]

Defendant Dillman is an individual residing in San Francisco County, California.[3] Dillman has no ownership in NAC, and has no agency relationship with Plaintiffs.

BB AML Holdings is a limited liability company duly formed and existing under the laws of the state of Delaware but operating in California, and having its principal place of business in San Francisco, California. Dillman is a manager of BB AML Holdings. David Mata is also a manager. Plaintiffs have no affiliation with or ownership in BB AML Holdings, and they have no agency relationship with it.

NAC is an acronym for National Aten Coin. Aten Coin is a form of digital currency presided over by the NAC Foundation, an organization that supports the identification of based block chain technology and digital currencies. It is the creator of the Aten Coin, the first-generation non-anonymous digital currency. NAC developed the next generation digital currency, one that contains safety features and a way to prevent unethical people and criminal elements known to law enforcement from using in the way they have exploited other forms of digital currency.

AML Bitcoin is a form of digital currency created by NAC, and the successor to the Aten Coin digital currency. To distinguish the two, AML Bitcoin Tokens represent what later became the AML Bitcoin digital currency. AML Bitcoin Tokens preceded the AML Bitcoin and did not have any specialized features that the AML Bitcoin currently possesses. In effect, AML Bitcoin Tokens provided the right to pre-purchase AML Bitcoin in the form of tokens which could be converted in a 1:1 ratio for AML Bitcoins once the AMC Bitcoin project was finished. This fact was stated on NAC's website, in its purchase agreements, and in the Terms and Conditions that

---

[2] The statement of facts is based upon the Declaration of Marcus Andrade, attached hereto as **Exhibit 1.**

[3] Dillman was served via Publication and default taken against both of these failures to plead.

one was required to accept prior to even gaining full access to the website.[4]

On April 12, 2020, AML Bitcoin development, incorporating anti-money laundering features, was completed. Existing AML Bitcoin Token holders are now able to convert their tokens to AML Bitcoins on a 1:1 ratio. Prior to the launch, on March 6, 2020 Marcus Andrade announced that pending an audit, the launch of the AML Bitcoin would take place, and it did. This action relates to the purchase and sale of AML Bitcoin Tokens.

Mr. Andrade is the President and sole owner of NAC, the creator of the AML Bitcoin Token that became the AML Bitcoin. The offering of AML Bitcoin Tokens commenced in August 2017.

An intermediary introduced Mr. Andrade to Dillman in 2017. On or about July 7, 2017 Block Bits, GP was formed by Dillman and others. Dillman was interested in AML Bitcoin Tokens and, through the intermediary, he purchased AML Bitcoin Tokens from Mr. Andrade in August 2017. On August 28, 2017, Block Bits GP entered, through Dillman, into a direct agreement with Mr. Andrade to purchase some of his personal AML Bitcoin Tokens for $60,000.00. Block Bits GP bought 135,555.555 AML Bitcoins Tokens, which were transferred to it for $0.45 per coin. Both parties agreed to specific established terms and conditions stated in the written purchase agreement.

On or about August 28, 2017, Block Bits LLC, through an intermediary, entered into a direct purchase agreement with Mr. Andrade to purchase some additional inventory of his personal AML Bitcoin Tokens. Specifically, Block Bits LLC purchased 287,555.555 AML Bitcoin Tokens for $129,400.00. Those AML Bitcoins Tokens were then transferred to Block Bits LLC for $0.45 per coin. Although they did not speak directly, both parties agreed to specific established terms and conditions stated in the written purchase agreement.

During the subsequent AML Bitcoin Token IPO, Block Bits LLC purchased additional tokens for $1.25 per coin. Block Bits LLC direct purchases and online purchases totaled 1,549,196.555 AML Bitcoin Tokens, for a total price of $1,693,400.00.

---

[4] See **Exhibit 1-A** hereto.

From on or about January 12, 2018 to February 14, 2018, Dillman caused $1,564,000 to be wire transferred to an attorney trust account of NAC corporate counsel in Nevada. Protocol restrictions on the "DS Account" provided that NAC would not receive any funds for goods purchased until the appointed CPA confirmed with the attorney overseeing the trust account that all purchasers, like Bit Blocks LLC, first received what they purchased. As in all cases, the funds were received by corporate counsel in Las Vegas, David Salmon, who then ensured that Block Bits LLC received the AML Bitcoin Tokens purchased before NAC was paid.

On January 14, 2018, Dillman e-mailed Andrade saying:

> Block Bits is putting in an order for $50 million worth of AML Bitcoin. However, due to the large size of the wire an (sic) extra level of KYC ("Know Your Customer") scrutiny is being added to the banks. . . To show you what we are serious about the buy, we have gone ahead and sent you an initial wire of $850,000 yesterday (1/12/2018) (sic).

Despite this "order" for $50 million worth of AML Bitcoin, however, Dillman and Block Bits LLC never purchased any additional AML Bitcoin Tokens beyond the $1,564,000 in wire transfer purchases made in January and February 2018. Furthermore, BB AML Holdings did not purchase AML Bitcoin Tokens directly from either of the Plaintiffs.

Like other digital currencies, AML Bitcoin Tokens are downloaded to the buyer's digital "wallet." Prior to any purchases being consummated, the published Terms and Conditions on NAC's website must be agreed to by the purchaser. No AML Bitcoin Token wallets can be downloaded without the buyer first accepting the Terms and Conditions of NAC.

On February 9, 2018, Mr. Boyer, individually, purchased AML Bitcoin Tokens online for a total of $1,500.00. Mr. Boyer necessarily accepted the Terms and Conditions, or he would not have bene able to download to his digital wallet and take possession of his AML Bitcoin Tokens.

BB AML Holdings was formed in Delaware on January 11, 2018, as a private investment company. According to an SEC Form D filing by that entity, it offered $2,000,000.00 in interests to investors and solicited investors in six states. Neither Mr. Andrade nor NAC were investors. Indeed, this entity had and has no relationship to Mr. Andrade or NAC. The SEC filing states that between January 12, 2018 and March 1, 2018, Mr. Boyer and 24 others had invested $1,580,000.00

in BB AML Holdings, with another $420,000.00 of investment in the fund reportedly available. BB AML Holdings never entered any direct or online purchases with Mr. Andrade or NAC.

According to information received from Mr. Boyer, certain AML Bitcoin Tokens purchased by Block Bits LLC ended up in the possession of BB AML Holdings, but neither NAC nor Mr. Andrade had any knowledge that the AML Bitcoin Tokens acquired by Block Bits LLC would end up being held by BB AML Holdings, or any of its investors. That was never disclosed by the other Defendants. Only after the fact did Dillman and Block Bits LLC inform NAC and Mr. Andrade about the occurrence of transfers of AML Bitcoin Tokens they purchased, and they did so without ever mentioning BB AML Holdings specifically. Moreover, Mr. Andrade and NAC had no knowledge of the Block Bits LLC's funding sources at the time of its initial purchases.

On or about July 31, 2018 (according to an internal Statement of Account of BB AML Holdings provided to Mr. Andrade by Ben Boyer on about March 2, 2020), the Boyer Family Trust transferred directly to BB AML Holdings 275,186.2484 AML Bitcoins Tokens from an inventory it somehow acquired. NAC believes that Boyer Family Trust acquired this same inventory from BB AML Holdings, out of the purchases made by Block Bits LLC in 2017. Similar additional transfers appear to have been made on August 16, 2018 for 161,096.561 AML Bitcoin Tokens. NAC and Mr. Andrade were not acquainted with the Boyer Family Trust, and they did not know about these third-party transactions at or near the time they reportedly occurred.

NAC treated the 1,000 plus purchasers of AML Bitcoin Tokens during the AML Bitcoin Token offering the same. To download AML Bitcoins to a wallet BB AML Holdings agreed to adhere by the Terms and Conditions for purchasing AML Bitcoin Tokens. The Terms and Conditions included the following statements:

> AML Bitcoin and/or AML Token have no underlying collateral; the AML Bitcoin and/or AML Bitcoin Token is merely an unsecured cyber currency or digital coin or in the case of the AML Bitcoin Token, a digital token for the exchange to an AML Bitcoin.
>
> AML Bitcoin and/or AML Bitcoin Token will not be redeemed by BGCI or NAC and You are not relying upon NAC to be a source of liquidity for You or Your purchase of AML Bitcoin and/or AML Bitcoin Token.
>
> Neither AML Bitcoin and/or AML Bitcoin Tokens nor any agreement related to Your purchase of AML Bitcoin and/or AML Bitcoin Tokens creates or constitutes

> a debt of NAC to You. Neither BGCI nor NAC is obligated to pay You any returns or repayment regarding Your purchase of AML Bitcoin and/or AML Bitcoin Tokens.
>
> AML Bitcoin is a medium of exchange and not a pooled interest in any business entity or common enterprise or a business venture involving You and BGCI, NAC, ABTC or its affiliates or subsidiaries. . .
>
> You have not purchased and have no intention of purchasing AML Bitcoin, AML Bitcoin Tokens. . . .  and/or any other company or product offered by NAC for investment purposes and You expect no return on investment.

(See **Exhibit 1-A**.)

Neither Block Bits LLC, Block Bits GP, nor Dillman ever shared any of their client data with NAC or Mr. Andrade, and Plaintiffs were never aware of the transactions between those Defendants and their clients/investors. Nor were Mr. Andrade or NAC privy to any dealing between AML BB Holdings and its investors, until Mr. Boyer provided the above referenced information on or about March 2, 2020.

However, according to a 2019 complaint filed in Superior Court for the County of San Francisco by the Boyer Trusts, as well as the judgment that resulted from it, those trusts transferred a large number of AML Bitcoin Tokens to Mr. Dillman in the fall of 2018. Specifically, Boyer Trusts' California pleading alleges that on October 24 and 25, 2018, Mr. Boyer transferred 1,050,000 AML Bitcoin Tokens from the Boyer Family Trust to Dillman, and/or the Defaulted Defendants. According to the Statement of Accounts received from Mr. Boyer for both Boyer Trusts on that date, the AML Bitcoin Tokens they owned were held by Dillman and/or Block Bits LLC after October 2018. See Boyer Complaint, attached hereto as **Exhibit 3**; see also, Boyer Judgment, attached hereto as **Exhibit 4**.

NAC only became generally aware that Block Bits LLC had "bought out" the AML Tokens Mr. Boyer purchased, by way of an e-mail received on or about December 26, 2018 from David Mata, a partner of Dillman's in Block Bits LLC. At that point, Mata simply told Mr. Andrade that Block Bits LLC or Dillman had purchased from Mr. Boyer and the Boyer Trusts all AML Bitcoin Tokens they acquired. Subsequent events later confirmed that  Boyer Trusts had, in fact, sold all AML Tokens they acquired.

Neither NAC nor Mr. Andrade, however, were aware of the series of alleged agreements between Mr. Boyer and Dillman specified in the Boyer Complaint. Unrelated to Plaintiffs, on December 13, 2018, Dillman entered these several purchase agreements with Mr. Boyer to buy from Boyer's interests in some 2,564,652 AML Bitcoin Tokens. These agreements, according to the Boyer Complaint, transferred all of Boyer's AML Bitcoin Tokens to Dillman and personally obligated Dillman to pay Mr. Boyer $2,989,652, for a blended price of $1.17 per AML Bitcoin Token. Dillman was to pay all amounts due by December 31, 2018. Mr. Boyer later extended that date. The four Asset Purchase Agreements dated December 13, 2018 included: 1) An agreement for Dillman to purchase 228,369 AML Bitcoin Tokens from the Boyer Trust for $228,369.00; 2) An agreement for Dillman to purchase from BB AML Holdings (in which Boyer Trusts were investors) 100,000 AML Bitcoin Tokens for $150,000; 3) An agreement for Dillman to purchase from Boyer Family Trust 1,486,283 AML Bitcoin Tokens for $1,486,283.00; and 4) An agreement for Dillman to purchase another 750,000 AML Bitcoin Tokens from BB AML Bitcoin Holdings for $1,125,000.00. As per the California action filed by Mr. Boyer, however, after receiving the AML Bitcoin Tokens from Mr. Boyer, Dillman never paid any of the amounts due under the Asset Purchase Agreements.

The simple form Boyer Complaint, filed in San Francisco County Superior Court as case number CGC-19-575158, asserts breach of contract claims for each of four agreements, on behalf of the Benjamin Boyer Trust and Boyer Family Trust.[5] Dillman never appeared in that action to dispute any claims against him. On June 19, 2019, Mr. Boyer, as trustee for the Boyer Trusts obtained a judgment against Dillman in the amount of $3,078,787.06, plus pre-judgment interest and costs, as damages incurred for the value of the transferred AML Tokens for which Dillman failed to pay the Boyer Defendants, in breach of the four Asset Purchase Agreements.

Mr. Boyer later claimed that Plaintiffs were somehow responsible for these losses, even though the losses stem from Dillman's failure to pay Boyer Trusts for the AML Tokens they transferred to Dillman and/or Block Bits LLC. This assertion, which is a source of ongoing

---

[5] BB AML Holdings does not appear to be mentioned in that action.

nuisance and cost, created a dispute and controversy between the parties requiring a declaration of the parties' rights that led to filing of the instant action. In this action, Dillman and BB AML Holdings did not appear to defend that allegation and claim against itself, and NAC and Mr. Andrade hereby seek judgment as to those allegations and that claim.

### III.  PROCEDURAL BACKGROUND

The Complaint was filed in the Eighth Judicial District Court on May 19, 2020 and was removed to the United States District Court – District of Nevada on June 9, 2020 by Defendant Benjamin Boyer, individually and as Trustee of the Boyer Family Trust and Benjamin Boyer Trust. [ECF No. 1]. On June 16, 2020, the Boyer Trusts filed a motion to dismiss [ECF No. 4].

NAC served Block Bits Capital LLC and Block Bits Capital GP, October 13, 2020. They failed to answer or otherwise plead, and the clerk of court entered defaults against them on November 18, 2020 [ECF No. 28]. NAC applied for default judgments against those defendants on December 16, 2020 [ECF No. 30].

Defaulted Defendant BB AML Holdings was served with a copy of the Summons and Complaint, as well as the First Amended Complaint and Notice of Removal, by service on the Delaware Secretary of State, on December 8, 2020. [ECF No. 35-1]. The Clerk of the Court entered the Default against BB AML Holdings on January 14, 2021, for failure to file an answer or other responsive pleading [ECF No. 38].

Defaulted Defendant Dillman was served with a copy of the Summons and Amended Complaint, via Publication in the Bay Area Reporter on December 24, 2020, December 31, 2020, January 7, 2021, and January 14, 2021. The Clerk of the Court entered the Default against Dillman, on January 29, 2021, for failure to file an answer or other responsive pleading. [ECF No. 43].

On March 17, 2021, the Boyer Defendants were dismissed from the Action on grounds the Court lacked personal jurisdiction over them [ECF No. 44], thereby rendering Boyer Defendants' Response to Motion for default judgment against BB GP and BB LLC [ECF No. 34] moot.

NAC previously filed an Application for Entry of Default Judgment Against Block Bits Capital LLC and Block Bits Capital GP [ECF No. 30]. The Court conducted a hearing concerning that application on August 26, 2021. At the hearing, the Court directed counsel for NAC to file

applications for default judgment as to the defendants remaining in this action, namely Dillman and BB AML Holdings.

By way of this application and Plaintiffs now ask the Court to enter a final default judgment against Dillman, BB GP, BB LLC, and BB AML Holdings.[6]

### IV.   LEGAL ARGUMENT

**A.   The Court has authority to grant Default Judgment.**

Pursuant to Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed.R.Civ.P. 55(a). Federal Rule of Civil Procedure 55(b)(2) provides that "a court may enter a default judgment after the party seeking default applies to the clerk of the court as required by subsection (a) of this rule." Fed.R.Civ.P. 55(b)(2); *see also* Local Rule 77-1(b). Here, the Clerk entered Default against Defendants on November 18, 2020. There have been no challenges to the Defaults as of the date this Application, and their inaction has not otherwise been excused. *See* Docket.

The choice whether to enter a default judgment lies within the discretion of the trial court. *Nevada Property 1 LLC v. Newcosmopolitanlas Vegas.com*, 2013 WL 167755 (D.Nev. 2013), citing *Aldabe v. Aldabe*, 616 F.3d 1089, 1092 (9th Cir.1980). As stated in *Nevada Property 1 LLC*, when exercising this discretion, the Court should consider the seven factors articulated by the Ninth Circuit in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir.1986). These factors are:

> (1) the possibility of prejudice to plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) the policy favoring a decision on the merits.

*Id.* In applying these factors, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Nevada Property 1 LLC* *1, quoting *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

/ / /

---

[6] See ECF No. 30.

**1.     Plaintiff will be prejudiced if default judgment is not entered.**

The first factor considers whether Plaintiffs will be prejudiced "if [Plaintiffs'] motion for default judgment is not granted, and specifically if [Plaintiffs] will likely be without other recourse for recovery." *Nevada Property 1 LLC,* quoting *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). In this case, Plaintiffs seek a declaratory judgment against Dillman and BB AML Holdings, and no other means exists for obtaining that relief. Thus, Plaintiffs will be prejudiced if default judgment is not entered.

**2.     Plaintiffs have a meritorious claim, stated in detail in the complaint, and the sufficiency cannot be disputed.**

The second and third *Eitel* factors favor a default judgment where the claims are meritorious, and the complaint sufficiently states a claim for relief. Plaintiffs complaint against Dillman and BB AML Holdings state "a plausible claim for relief." *See Nevada Property 1 LLC* *2; (See ECF No. 1). Plaintiffs seek default judgment on its claim for declaratory relief, a claim meritorious on its face, and which the duly served Dillman and BB AML Holdings failed to answer or challenge. Moreover, the third factor, sufficiency of the complaint cannot be questioned.[7] Certainly, BB AML Holdings, of whom Dillman is manager, can well understand the nature of the allegations and claim. As noted above, Mr. Boyer obtained a judgment for over $3 million against Dillman arising out of this same set of facts. Accordingly, the second and third factor weigh in favor of default judgment.

As set forth herein, Plaintiffs have established that their claims are meritorious and sufficiently stated in its Amended Complaint, such that the second and third factor weigh in favor of default judgment.

**3.     Plaintiffs' damages are proportionate to Defendants' conduct.**

The fourth factor considers whether "the amount of money requested in relation to the

---

[7] While the Court must accept the allegations in the Amended Complaint as true (FRCP 8(b)(6)), and *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); Plaintiff also submits the Andrade Decl. to support its allegations.

seriousness of the defendant's conduct, whether large sums of money are involved, and whether 'the recovery sought is proportional to the harm caused by [the] defendant's conduct." *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1212 (W.D. Wash. 2014). Here, Plaintiffs seeks declaratory relief, so damages do not come into play. As in *Property 1 LLC*, this factor neither favors nor disfavors Plaintiffs. See *Property 1 LLC* *2.

### 4. There are no questions of material fact in dispute.

The fifth *Eitel* factor also favors default judgment for Plaintiffs. As noted above, once the court clerk enters a default, the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages. *Property 1 LLC* *1, quoting *Geddes*, 559 F.2d at 560. There is no dispute, nor can there be any dispute, as to the allegations against Dillman and BB AML Holdings. Dillman and BB AML Holdings failed to appear and rebut or deny the allegations. Given the sufficiency of the complaint, as bolstered by the declaration, and defendant's default, "no genuine dispute of material facts would preclude granting [plaintiff's] motion." *Cal. Security Cans*, 238 F.Supp.2d at 1177. Thus, the fifth factor weighs in favor of the entry of default judgment.

### 5. There is no evidence of excusable neglect.

The sixth factor is whether Dillman and BB AML Holdings' default was the result of excusable neglect. Defaulted Defendant was served with a copy of the Summons and Complaint, as well as the First Amended Complaint and Notice of Removal by service on the Delaware Secretary of State, on December 8, 2020. [ECF No. 35-1]. It failed to appear in the action. There is no evidence that its failure to do so is attributable to excusable neglect. *See, United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993) (holding that it was "perfectly appropriate" for the district court to enter default judgment against a corporation that failed to appear in the action through licensed counsel). Indeed, the failure of the BB AML Holdings' principal, Dillman, to see that it made an appearance seems entirely consistent with his failure to appear in Mr. Boyer's California action, which resulted in a $3 million judgment. Thus, the sixth factor weighs in favor of the entry of default judgment.

///

**6.    A determination on the merits cannot occur unless Dillman and BB AML Holdings appear, and it chose not to do so.**

The seventh factor is the Federal policy of favoring decisions on the merits. *Eitel*, 782 F.2d at 1472. "But the mere existence of Rule 55(b) 'indicates that this preference, standing alone, is not dispositive.' *Cal. Security Cans*, 238 F.Supp. at 1177". Property 1 LLC *2. When a party fails to answer a complaint, it "makes a decision on the merits impractical, if not impossible." *Cal. Security Cans* at 1177.

Here, Dillman and BB AML Holdings did not appear, and the Court cannot hear the case against it on its merits. Moreover, Dillman and BB AML Holdings may always attempt to seek relief from the default judgment upon a proper showing. Accordingly, under the factors set forth in *Eitel*, the Court should exercise its discretion and enter default judgment against Dillman and BB AML Holdings.

In addition, NAC seeks an award of fees and costs. This work was necessitated by Defendants' actions, as detailed in the Complaint and subsequent papers, as well as the Court's orders in this action. As stated in the supporting declaration of Eric R Olsen, the fees and costs incurred are reasonable under the test of *Brunzell,* especially when considered in light of the difficulties encountered in getting service on the Defendants and reaching this point. Attorney fees incurred and sought by NAC in this matter are $40,700.00, with costs of $4,550.66. This amount excludes the fees related to Boyer Defendants' motion to be dismissed from the action.

## V.
## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that the Court grant the instant Application, and order as follows:

Findings of Fact, Conclusions of Law, and a Judgment in Plaintiffs' favor and against Defendants Dillman and Block Bits AML Holdings, LLC, as well as Block Bits Capital LLC and Block Bits Capital GP on Plaintiffs' claim for declaratory relief to the effect that as to these defendants nothing in any contract or business relationship between that Defendant and either

NAC or Mr. Andrade creates a duty or imposes liability on Plaintiffs with respect to any clients/investors/customers of that Defendant. Plaintiff submits a proposed default judgment to that effect as **Exhibit 5** hereto. The proposed default judgment also includes an award of attorney fees and costs.

DATED this 8th day of September 2021.

GARMAN TURNER GORDON LLP

*/s/ Eric R. Olsen*
ERIC R. OLSEN
Nevada Bar No. 3127
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119

**CERTIFICATE OF SERVICE**

The undersigned, an employee of Garman Turner Gordon LLP, hereby certifies that on the 8th day of September 2021, she caused a copy of the foregoing **APPLICATION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS BLOCK BITS AML HOLDINGS, LLC and JAPHETH DILLMAN**, to be served electronically to all parties of interest through the Court's CM/ECF system as follows:

Adam Hosnmer-Henner
ahosmerhenner@mcdonaldcarano.com
Chelsea Latino
clatino@mcdonaldcarano.com
McDonald Carano LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV 89102

                                                   */s/ CM Wrangham*
                                                   An employee of
                                                 GARMAN TURNER GORDON LLP

4831-1064-9593, v. 1

Garman Turner Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000